APPLE COMPUTER, INC., Plaintiff,

v.

MICROSOFT CORPORATION and
Hewlett–Packard Company,
Defendants.

No. C–88–20149–WWS.

United States District Court,
N.D. California.

March 20, 1989.

Jack E. Brown, Brown & Bain, P.A., Phoenix, Ariz., Lois W. Abraham, Chris R. Ottenweller, Martin L. Lagod, Brown & Bain, Palo Alto, Cal., for plaintiff Apple Computer, Inc.

David T. McDonald, Karl J. Quackenbush, Shidler McBroom Gates & Lucas, William O. Ferron, Jr., Seed & Berry, Seattle, Wash., John N. Hauser, Lynn H. Pasahow, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for defendant Microsoft Corp.

S. Leslie Misrock, Jonathan A. Marshall, Jon R. Stark, Pennie & Edmonds, New York City, Neil Boorstyn, Townsend and Townsend, San Francisco, Cal., Stephen P. Fox, Roland I. Griffin, Hewlett–Packard Co., Palo Alto, Cal., for defendant Hewlett–Packard Co.

## MEMORANDUM OF DECISION AND ORDER

SCHWARZER, District Judge.

Apple Computer, Incorporated ("Apple") brings this action against the Microsoft Corporation ("Microsoft") and the Hewlett–Packard Company ("H–P"), alleging that the visual displays and images in Microsoft's product Windows 2.03 infringe Apple's copyrighted audiovisual works. Microsoft denies the allegations and moves for summary judgment on its affirmative defense that the visual displays in Windows 2.03 are within the scope of a license granted by Apple to Microsoft in a Settlement Agreement entered into by the parties on November 22, 1985 ("1985 Agreement"). Apple, in turn, moves for partial summary judgment declaring that Windows 2.03 is an unauthorized derivative work of Apple's copyrighted visual displays and dismissing Microsoft's affirmative defense based on the 1985 Agreement.[1]

Argument by counsel has been heard and counsel have had an opportunity to examine and comment on a prior draft of this ruling.

The question before the Court concerns the interpretation of the agreement between the parties, which is a question of law. *Beck Park Apts. v. United States Dept. of Hous. & Urb. Dev.*, 695 F.2d 366, 369 (9th Cir.1982). The parties agree that there is no disputed material issue of fact and that the question before the Court is ripe for decision on these motions for summary judgment.

## I. FACTUAL BACKGROUND

### A. *The 1985 Agreement*

Apple achieved commercial success with its Macintosh personal computer, largely because of its distinctive user friendly graphic user interface operating environment. Apple copyrighted the visual displays in the Macintosh operating system.

Microsoft developed a competing graphic user interface, called Windows, for IBM compatible personal computers. In October 1985 Apple informed Microsoft that it thought Windows infringed on its copyrighted visual displays. Apple and Microsoft entered negotiations to resolve their dispute. These negotiations resulted in the 1985 Agreement which is the subject of the motions now before the Court.

The preamble to the 1985 Agreement states that "a dispute has arisen concern-

---

1. In deciding the motions before it, the Court does not reach defendants' other affirmative defense that Apple's copyrights are invalid. It considers only whether the 1985 Agreement affords defendants a complete defense to this action.

ing the ownership and possible copyright infringement as to certain visual displays generated by ... 'Microsoft Windows Version 1.0' " and five named applications programs created by Microsoft to run on the Macintosh. (MS App., Ex. A.)[2] Microsoft acknowledged that the visual displays in the named programs "are derivative works of the visual displays generated by Apple's Lisa and Macintosh graphic user interface programs." (*Id.,* ¶ 1.)

Apple granted Microsoft a non-exclusive "license to use these derivative works in present and future software programs" (*id.,* ¶ 2), and Apple released Microsoft from any copyright or other claim that it might have had "as to Windows Version 1.0" (*id.,* ¶ 4). Microsoft, in turn, granted Apple a five-year, non-exclusive license "to use any visual displays created by Microsoft ... as part of its Microsoft Windows retail software product." (*Id.,* ¶ 5.) Microsoft also agreed to develop software necessary to make the Macintosh attractive to business users, and to defer release of its Excel program for IBM compatible personal computers.

The 1985 Agreement also contains an integration clause stating that it constitutes the entire agreement between the parties. (*Id.,* ¶ 7.G.)

### B. *Drafting of the 1985 Agreement*

Apple prepared the initial draft of the settlement agreement, providing for a narrow license. (MS App., Ex. 0.) Apple's draft would have granted Microsoft a non-exclusive

> license under Apple's visual copyrights covering Apple's Lisa and Macintosh user interfaces for Microsoft Windows and other Microsoft software products which are compatible with Apple's Macintosh computer ... only for use in Microsoft Windows program (as set forth in Exhibit A) in the form that shall exist

after the completion of the changes set forth in paragraph 5 and such applications as are available as of the date of this Agreement that operate under Windows. After November 1, 1986, additional applications to operate under Microsoft Windows shall be covered by the license grant of this Agreement but at no time shall this grant extend to any appearance, look, feel, visual feature or operation other than that incorporated in Microsoft Windows as it shall exist after completion of the changes set forth in paragraph 5.

(*Id.,* ¶ 1.)

Microsoft rejected the narrow license in Apple's draft and after further negotiations prepared a new draft agreement. (MS App., Ex. P.) Microsoft's draft was substantially different from the Apple draft and similar in form to the final agreement. The only relevant changes made to arrive at the final agreement were to specify more precisely that the dispute and settlement were with respect to visual displays in Windows 1.0. The description of Windows in the preamble by reference to the object code and the words "the current version of Windows" in the release clause both were replaced with the words "Microsoft Windows Version 1.0."

## II. DISCUSSION

The issue before the Court is whether the license granted by Apple in the 1985 Agreement provides Microsoft with a complete defense against Apple's claims that the visual displays in Windows 2.03 infringe Apple's copyrights. Apple contends that the license is limited to visual displays in Windows 1.0 or virtually identical to those in Windows 1.0. Microsoft, in turn, contends that the license is broad enough to cover enhancements to the Windows program, and that, even if Apple's narrow construction is adopted, the visual displays

---

**2.** Citations to source materials conform to the following conventions: (1) Appendix to Apple's Motion for Partial Summary Judgment—"Apple App."; (2) Supplemental Appendix to Apple's Motion—"Apple Supp.App."; (3) Apple's Exhibits and Deposition Testimony Subject to Protective Order—"Apple Conf. App."; (4) Appendix to Apple's Response—"Apple Resp.App."; (5) Appendix to Apple's Reply—"Apple Reply App."; and (6) Appendix to Microsoft's Motion for Summary Judgment—"MS App.". Citations to depositions are by name of deponent, page number, and volume number where appropriate.

in Windows 2.03 are virtually identical to those in Windows 1.0.

### A. *Scope of the License Under the 1985 Agreement*

The Court must interpret the 1985 Agreement so as to give effect to the mutual intentions of the parties at the time that the Agreement was entered. Cal.Civ. Code § 1636. The parties have submitted voluminous excerpts from depositions in which, for the most part, the protagonists testified to their intentions in entering into the 1985 Agreement in a manner invariably consistent with their respective positions in this law suit. Such self-serving testimony is of little assistance in interpreting the Agreement. Instead, the Court must rely principally on the contemporary evidence. Cal.Civ.Code § 1647; *see also Anchor Casualty Co. v. Surety Bond Sav. & Loan Ass'n,* 204 Cal.App.2d 175, 183, 22 Cal. Rptr. 278, 282 (1962) (prior negotiations relevant).

■ That evidence shows that whether the license should be limited to the existing visual displays in Windows 1.0 was a critical point of contention. Apple's initial draft contained a narrow license to use Apple's visual displays only in the then current version of Windows and in current and future applications programs. It also limited future applications programs so that the graphic display that a user would see on running a Windows applications program would never have an appearance, look, or feel other than that which already existed in Windows at the time of the 1985 Agreement. Microsoft rejected this narrow license and proposed different language. Apple felt that Microsoft's proposed language was too broad. The written comments of Apple's associate general counsel Rappaport on Microsoft's proposed license stated that the "[g]rant is broader than we intend; we intend to license only their current version of Windows." (MS App., Ex. Q.)

When the two principals primarily responsible for drafting the agreement, Rappaport and Microsoft vice president of legal and corporate affairs Neukom, met to go over Microsoft's draft, this point was discussed. Neukom testified that he understood from Rappaport that "he thought this was a product license, that is, that whatever visuals would be covered by the license would only, could only be used by Microsoft in current versions of its Windows product." (Neukom Depo., 53–54.) Neukom continued: "We felt quite to the contrary and had reflected in our draft how differently we approached the question ... because our license was intended not to have a limitation to the current version of Windows." (*Id.,* 54.)

Thus, the issue was framed in the negotiations and the choice of words in the 1985 Agreement as executed must necessarily be considered to have been deliberate.

Had Apple's narrow provision been dropped without a substitute restriction, it would be reasonable to interpret the agreement as giving Microsoft a blanket license to develop future Windows programs.

However, the parties substituted language showing an intent to limit the license and accompanying release of claims to the visual displays in the then current version of Windows, Version 1.0, and in the named applications programs. The preamble of the Agreement defines the subject matter of the dispute as "certain visual displays generated by several Microsoft software *products,*" and then goes on to specify those products as "Microsoft Windows *Version 1.0*" and certain named applications programs. (MS App., Ex. A (emphasis added).) Microsoft then acknowledges that "the visual displays in the above-listed Microsoft programs are derivative works of the visual displays generated by Apple's Lisa and Macintosh graphic user interface programs." (*Id.*) The license granted by Apple to Microsoft is "to use *these derivative works* in present and future software programs." (*Id.* (emphasis added).) Finally, Apple's release of copyright and other claims against Microsoft goes only to "Microsoft Windows *Version 1.0.*" (*Id.* (emphasis added).)

Microsoft stresses that the license is for use in "present and future software programs," indicating that the parties foresaw

that Microsoft would continue to develop its Windows program, and intended to include future versions of Windows within the scope of the license. That language is limited, however, by the specification of the subject matter of the license, i.e., the "derivative works" as defined in the preamble and first paragraph of the 1985 Agreement. Hence these words do not expand the scope of the license to allow Microsoft to develop future versions of Windows as it pleases; instead they allow Microsoft only to use the licensed visual displays in future versions of Windows and in different applications programs, whether then in existence or not. That conclusion is supported by comparison of the specific language used in the license from Apple to Microsoft with the more general language used in the license from Microsoft to Apple, licensing Apple "to use *any new visual displays* created by Microsoft." (*Id.* (emphasis added).) *See* Cal.Civ.Code § 1641 (one clause of contract may be used to interpret another clause in contract).

■ Microsoft also contends that overlapping windows are not a visual display but, rather, that each individual window is itself a visual display, and that the combination of windows on the screen is a screen display and hence not a derivative work subject to the restrictions of the license. Thus, it maintains, the license allows it to put different windows on the screen in any way that it chooses, whether tiled or overlapping. Microsoft's technical witnesses concede, however, that the term "visual display" could mean anything from a single visual element to the entire screen display. (Trower Depo., II 23; Konzen Depo., 97–99.) Moreover, in light of Microsoft's promotion of Windows 2.0 as visually new and different, Microsoft's unsupported assertion of this distinction between "screen display" and "visual display" is not persuasive.

Even if Microsoft's interpretation of the words "visual display" were as plausible as Apple's, because Microsoft drafted the language, Apple's interpretation would control. *See Interpetrol Bermuda Ltd. v. Kaiser Aluminum Int'l Corp.*, 719 F.2d 992, 998 (9th Cir.1983) ("Where, after examining all the evidence, including the course of relations between parties and the circumstances under which they executed the contract, a question of contract interpretation remains, a court is entitled to resolve the question against the party who prepared a writing.").

■ Microsoft also contends that the license covers any visual display that can be generated by any of the five named applications programs when run on the Macintosh. The parties devote considerable space in their memoranda to argument over the meaning of the words "generated by" in the preamble to the 1985 Agreement. The dispute is over whether the visual displays in issue are "generated by" Microsoft's applications software or by the Macintosh system software. This argument, reminiscent of the disputes of medieval savants over how many angels can dance on the head of a pin, need not be resolved.

There is no evidence that the negotiators of the 1985 Agreement were concerned with the highly technical and complex matter of the interplay of applications and system software. To the contrary, it is clear that what they were concerned with was the end product: the visual interface. Neukom's testimony shows that when he drafted the agreement, he attached no technical meaning to the words he chose; he used "visual displays generated by" and "visual displays in"—the latter being the words used to define derivative works in paragraph 1—interchangeably. (Neukom Depo., 98–99.) And to construe the 1985 Agreement, by virtue of the addition of two innocuous words in one sentence, as licensing all visual displays that can be called up by running five applications programs on Macintosh would defy common sense.

Microsoft is correct when it maintains that Apple received valuable consideration for the license; but it is not reasonable to construe the 1985 Agreement as giving Microsoft in return an essentially open-ended license to use whatever visual displays its named software could generate on a Macintosh, then or in the future. What Micro-

soft received was a license to use the visual displays in the named software products as they appeared to the user in November 1985.

■ Finally, Microsoft contends that, even if the license is limited to Windows 1.0, it would cover any visual display that an applications programmer could generate using Windows 1.0. Microsoft submits the declaration of one of its software engineers that he managed to write applications programs using Windows 1.0 that generated each of the visual displays offered by Apple as examples of infringing displays generated using Windows 2.03. (Gunderson Decl.)

This argument proves too much. If it were accepted, the logical conclusion would be that Apple licensed whatever visual displays a skilled programmer might be able to generate by writing new code that, incidentally, used calls to Windows 1.0 subroutines. This would amount to a license to all of the visual displays that make the Macintosh operating environment unique. Considering the great value to Apple of the graphic interface embodied in its Macintosh operating environment, it is contrary to reason and common sense to interpret the 1985 Agreement as creating a blanket license the limits of which are defined only by the limits of the ingenuity and skill of programmers. *See, e.g., Howe v. American Baptist Homes of the West, Inc.,* 112 Cal.App.3d 622, 627, 169 Cal.Rptr. 418, 420 (1980) (reasonable construction consistent with language of contract must prevail over unreasonable construction).

Accordingly, the plain intent and meaning of the 1985 Agreement is to grant a license and release[3] limited to the visual displays in Windows 1.0 and the named applications programs as they then existed and appeared to the user.

B. *Application of the License to Windows 2.03*

■ Regardless of how one interprets the license in the 1985 Agreement, if the

visual displays of Windows 2.03 are virtually the same as those of Windows 1.0, then Windows 2.03 is covered by the license. However, the testimony of Microsoft's witnesses and the contemporary record compel the conclusion that the visual displays of the two programs are fundamentally different.

The main applications window in Windows 1.0 uses a tiled format in which the different applications windows appear next to each other and do not overlap. (Apple App., Ex. 82, Microsoft Windows Software Development Kit, Application Style Guide, Version 1.03, p. 5.) Microsoft promoted this feature as distinguishing Windows 1.0 from other windowing programs. In the promotional brochure for Windows 1.0, after stating that Windows 1.0 allows an IBM compatible personal computer to "have the friendly kind of features that make computers like the Apple Macintosh so easy and efficient to run," the first distinguishing feature that Microsoft listed was

> No Overlapping. Unlike other windowing products, Microsoft Windows doesn't overlap its application windows. With Windows, your views are "tiled," conveniently sitting next to each other, so you can see all of them.... [Y]ou never "lose" a window.

(Apple App., Ex. 79, Microsoft Windows At a Glance.)

In contrast, the main applications window in Windows 2.03 is an overlapping window. (Apple App., Ex. 83, Microsoft Windows Software Development Kit, Application Style Guide, Version 2.0, p. 5.) Microsoft chairman Gates testified that "the fundamental differences [between the two versions of Windows] were in the code between these two things.... [W]e changed the Style Guide to encourage people to use overlapping, and we took the tile code out.... The top-level main windows were changed so that the built-in applications worked in an overlapped fashion." (Gates Depo., 55–57.) Microsoft director of user interface design Trower testified that "the

---

**3.** Microsoft contends that this interpretation of the license provision renders the release clause redundant. However, the license covers future

use of Apple's visual displays and the release covers past use.

most obvious difference between the products is the lack of tiled windows." (Trower Depo., 210.) Microsoft's lead programmer for the Windows user interface group Konzen agreed that "there are some fundamental differences between the visual displays of Windows 2.03 and the visual displays of Windows 1.0," including the change from tiled to overlapping windows. (Konzen Depo., 157–58.)

Microsoft featured this change from tiled to overlapping windows as a major selling point for Windows 2.0. The press release announcing the new version advertised a "new visual interface with overlapping windows." (Apple App., Ex. 85, Microsoft News Release.) And a Microsoft publication touting the new Windows system stated that there are substantial differences between Windows 1.0 and Windows 2.0, the first difference listed being the change from tiled to overlapping windows. (Apple App., Ex. 70, Vellon, *The OS/2 Windows Presentation Manager: Microsoft Windows on the Future*, Microsoft Systems J. 13, 15 (May 1987).)

Thus, it cannot be disputed that Windows 2.03 is significantly different from Windows 1.0. And this difference is significant to Apple. The Windows 1.0 operating environment, as shipped by Microsoft, was a tiled window system, different from the Macintosh operating environment; Windows 2.03 was designed, when run over an applications program, to generate overlapping windows, which is a major feature of the Macintosh operating environment; and Windows 2.03 is more similar in overall visual appearance to the Macintosh visual displays than Windows 1.0. (Konzen Depo., 26, 78, 118; *see also* Trower Depo. 210, 219; Davis Depo., 89.)

Without contesting that Windows 2.03 represents a major change from Windows 1.0,[4] Microsoft contends that Windows 2.03 is still within the scope of the license because Windows 1.0 supported overlapping windows substantially similar to those featured in Windows 2.03. However, as dis-

cussed in the previous section, the mere fact that it is possible to generate overlapping windows using Windows 1.0 is not sufficient to bring all overlapping windowing programs within the scope of the license. That overlapping windows were an insignificant aspect of Windows 1.0 is confirmed by Microsoft's promotional material distinguishing Windows 1.0 from the Macintosh operating environment by featuring non-overlapping windows. (*See* Apple App., Ex. 79, Microsoft Windows At a Glance.) It is not reasonable to conclude that Apple gave up this valuable distinguishing feature in the absence of explicit language.

### C. *Estoppel of Microsoft to Deny Copyright Infringement*

Apple's contention that Microsoft is estopped to deny copyright infringement by reason of the 1985 Agreement is premature. Because the Court holds only that the Agreement is not a complete defense to the infringement claims against Windows 2.03, the issues of infringement and of whatever other defenses may be available to Microsoft must be deferred for resolution in the next phase of the litigation. The Court has no record before it that would enable it to determine whether there is a relevant and valid copyright and whether it is infringed. Thus it could not decide whether Microsoft is estopped to deny infringement of works for which it holds no license.

### III. ORDER

For the reasons stated, Apple's motion for partial summary judgment is granted to the extent that the Court determines and adjudicates that the November 22, 1985 Settlement Agreement is not a complete defense to Apple's infringement claims with respect to Windows 2.03. In all other respects, Apple's motion is denied without prejudice. Microsoft's motion for summary judgment is granted to the extent that the Court determines and adjudicates that

---

**4.** Microsoft would be hard pressed to make such a contention. The change in numbering from a "1" to the left of the decimal place to a "2"

represented a major new version release. (Shirley Depo., 25.; Davis Depo., 78.)

the November 22, 1985 Settlement Agreement licenses Microsoft to use the visual displays in Windows 1.0 and the named applications programs in current and future software products. In all other respects Microsoft's motion is denied.

The parties are directed to meet and confer with respect to further proceedings in this action and be prepared to discuss them at a status conference to be held on April 14, 1989, at 10 a.m.

IT IS SO ORDERED.