**APPLE COMPUTER, INC., Plaintiff,**

v.

**MICROSOFT CORPORATION and Hewlett–Packard Company, Defendants.**

**No. C–88–20149–WWS.**

United States District Court, N.D. California.

July 25, 1989.

---

Jack E. Brown, Brown & Bain, P.A., Phoenix, Ariz., Lois W. Abraham, Chris R. Ottenweller, Martin L. Lagod, Brown & Bain, Palo Alto, Cal., for plaintiff Apple Computer, Inc.

David T. McDonald, Karl J. Quackenbush, Shidler McBroom Gates & Lucas, William O. Ferron, Jr., Seed & Berry, Seattle, Wash., John N. Hauser, Lynn H. Pasahow, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for defendant Microsoft Corp.

S. Leslie Misrock, Jonathan A. Marshall, Jon R. Stark, Pennie & Edmonds, New York City, Neil Boorstyn, Townsend and Townsend, San Francisco, Cal., Stephen P. Fox, Roland I. Griffin, Hewlett–Packard Co., Palo Alto, Cal., for defendant Hewlett–Packard Co.

## MEMORANDUM OF DECISION AND ORDER

SCHWARZER, District Judge.

Apple Computer, Inc. ("Apple") has brought this copyright infringement action against Microsoft Corporation ("Microsoft") and Hewlett–Packard Company ("HP"), alleging that the visual displays in Microsoft's software product Windows 2.03 and HP's product NewWave infringe Apple's copyrighted graphic user interface.

Microsoft and HP previously moved for summary judgment under the Agreement between Apple and Microsoft dated November 22, 1985 ("Agreement"). In its prior ruling, the Court held that the Agreement is not a complete defense to Apple's infringement claims with respect to Windows 2.03. It also held that the Agreement licenses Microsoft "to use the visual displays in Windows 1.0 and the named applications programs in current and future software products." *Apple Computer, Inc. v. Microsoft Corp.*, 709 F.Supp. 925, 931–32 (N.D.Cal.1989).

In its motion Microsoft also sought an adjudication that the license covers a set of discrete visual displays and that the visual displays in Windows 2.03 are within this set. (Microsoft Memo. filed 2/13/89 at 3.) The Court rejected that claim insofar as it was based solely on the interpretation of the Agreement. Following issuance of the prior ruling, however, the parties submitted videotapes and other materials directed at a comparison of the visual displays in Windows 1.0 and those in Windows 2.03. HP also moved for partial summary judgment that the license covers discrete

visual displays. After further briefing and argument, following distribution to counsel of a prior draft of this memorandum, the Court now makes its rulings on Microsoft's requested adjudication and HP's motion.[1]

The question now before the Court is whether the Agreement, although not a complete defense, is a partial defense against the infringement claim and, if so, to what extent it licenses the visual displays in Windows 2.03 and NewWave.

## I.

■ Apple contends that the 1985 agreement was only "a license of the interface of Windows Version 1.0 as a whole, not a license of broken out 'elements' which Microsoft could use to create a different interface more similar to that of the Macintosh." (Apple Memo. 7.) Microsoft and HP contend that the license applies to discrete visual displays in Windows 1.0 individually and, therefore, that Windows 2.03 and NewWave are covered by the license to the extent that they include visual displays found in Windows 1.0.

The language of the 1985 Agreement does not support Apple's restrictive interpretation. The Agreement identifies its subject matter as *"certain visual displays generated by ... 'Microsoft Windows Version 1.0' "* and five named applications programs. (Microsoft Memo., Ex. A, Agreement, Preamble (emphasis added).) Microsoft acknowledged that these *"visual displays ... are derivative works* of the visual displays generated by Apple's Lisa and Macintosh graphic user interface programs." (*Id.,* ¶ 1 (emphasis added).)

Apple granted Microsoft a non-exclusive "license to use *these derivative works* in present and future software programs and to license them to ... third parties." (*Id.,* ¶ 2 (emphasis added).) Microsoft, in turn, granted Apple a non-exclusive license "to use any new visual displays created by Microsoft ... as part of its Microsoft Windows retail software product." (*Id.,* ¶ 5.)

The Agreement makes clear that the parties did not consider an interface and the visual displays generated by that interface to be synonymous, and that they chose the words of the license deliberately. The word "interface" is used in paragraph one in the context of Microsoft's acknowledgment that the licensed "visual displays ... are derivative works of the visual displays generated by Apple's Lisa and Macintosh graphic user interface programs." The juxtaposition in that sentence shows that the terms "visual displays" and "interface," as used in the Agreement, were not regarded by the parties as interchangeable.

Had it been the parties' intent to limit the license to the Windows 1.0 interface, they would have known how to say so. Instead, the "derivative works" covered by the license are identified as the "visual displays" in the Windows 1.0 interface, not the interface itself. And there is nothing in the 1985 Agreement that indicates that it was intended as a product license restrict-

---

**1.** At oral argument, counsel for Apple contended *for the first time* that the 1985 Agreement was ambiguous and therefore raised a triable issue of fact, citing this Court's article, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465 (1984). The full passage from which counsel selectively quoted disposes of this argument:

> The interpretation of a written instrument is likewise sometimes an issue of fact and sometimes an issue of law for Rule 56 purposes. While interpreting a writing which the court finds to be unambiguous is clearly a question of law, an issue of fact may be raised by a dispute over the intention of the parties to an unambiguous writing.

99 F.R.D. at 474 (footnotes omitted). Here there is no dispute over historical facts. The self-serving deposition testimony of Apple's wit-

nesses over what they intended by entering the 1985 Agreement does not create an issue of fact; if it did, any party to an agreement could force a trial simply by testifying to a contrary intention. There is no contemporary evidence of the intended meaning of the words "visual displays"; much less is there such evidence of a dispute over their meaning. What the contemporary evidence shows, as discussed in the Court's prior ruling, is that the text proposed by Apple during the negotiations, which would have given it the protection that it now seeks, i.e. the "no more like the Macintosh" limitation, was rejected by Microsoft and different language was agreed on. *See* 709 F.Supp. at 927. The question whether Apple can now impose that limitation on the Agreement is a legal question of interpretation properly decided on summary judgment.

ing Microsoft and its licensees to the use of the Windows 1.0 interface as a whole.

Apple contends that, notwithstanding the absence of any language in the Agreement to this effect, its negotiators understood that the license did not allow Microsoft to develop a new interface more similar to the Macintosh interface. The history of the negotiations, however, shows that Apple tried but did not succeed in obtaining Microsoft's agreement to a limitation of the license to Windows 1.0 taken as a whole, protecting against the development of interfaces more like the Macintosh look and feel. 709 F.Supp. at 927. Instead the parties executed a license to use specified visual displays.

To avoid the plain meaning of the Agreement, Apple seeks to impose a tortured interpretation on the words "visual display," namely that they serve only to "distinguish the computer code of Windows Version 1.0 from the audiovisual works which the code produced." (Apple Memo. 9.) Apple bases this argument on the fact that the Agreement does not anywhere refer to "individual visual display elements." (*Id.*) The failure of the Agreement to refer to "individual visual display *elements*", however, does not mean that, contrary to the plain meaning of the language of the Agreement, the license is not to use discrete visual displays.[2]

That the license of visual displays from Apple to Microsoft must mean what it says is also confirmed by the use of the same language in the license from Microsoft to Apple "to use any new visual displays created by Microsoft ... in [Apple's] software programs." (Microsoft Memo., Ex. A, Agreement ¶ 5.) This license clearly gives Apple the right to use individual visual displays created by Microsoft; Apple is not limited to incorporating the entire interface into its software programs if it wishes to use any new visual display created by Microsoft. This understanding of the effect of the license from Microsoft was shared by Apple's chief negotiator, Eisenstat, who testified that the license allowed Apple to incorporate into its Macintosh interface any "new visual feature" developed by Microsoft for Windows. (Microsoft Memo. 7.)

Furthermore, as pointed out by Microsoft and HP, Apple's current interpretation would render the parties' sublicensing rights worthless. Both Apple and Microsoft rely heavily on third-party programmers to develop applications programs to run under their respective operating environments, thus enhancing the value of the operating environments. Applications programs incorporate a mixture of visual features from the operating environment and new features added by the applications programmers. This necessarily changes the visual displays seen by the user.[3] Under Apple's contention that the licenses extend to the interface as a whole and do not allow deviation from that interface, such selective use of visual features from the operating environment and creation of different visual displays would violate the licenses. An interpretation that leads to such a result is unreasonable.[4]

Thus, as stated in the Court's prior ruling, the language of the license "allow[s]

---

**2.** Apple also contends that the use of the words "visual displays" in the license does "not ... warrant conversion of the Agreement into a license (whole or partial) for all future products created by Microsoft ... that arguably could trace some similarity to Windows Version 1.0." (Apple Memo. 9.) Apple is correct: "visual displays" means what it says, no more and no less; the use of those words in the license does not "allow Microsoft to develop future versions of Windows as it pleases," *see* 709 F.Supp. at 929, and neither does this ruling.

**3.** As HP points out, if the visual displays were not affected by an applications program, the user could not tell that the program was running, control the program, put information into

it, or take information out of it. (HP Memo. 5–6.)

**4.** In its comments on the Court's proposed memorandum Apple retreats from this position, stating that deviations from the Windows 1.0 interface would be permissible so long as they did not make "the appearance more similar to Apple's audiovisual works than was Windows Version 1.0." (Written Comments 6.) Of course, such language was expressly rejected by Microsoft and is not found in the Agreement. Moreover, its effect would be to give Apple a virtual veto power over all new software products exercisable according to wholly subjective criteria.

Microsoft ... to use the licensed visual displays in future versions of Windows and in different applications programs, whether then in existence or not." 709 F.Supp. at 929.

Contrary to Apple's suggestion, there is nothing in the copyright law that precludes the grant of such a license to use visual displays and to incorporate them into a new work that also includes new visual displays. A copyright license is a contract like any other contract and the starting point of the analysis must necessarily be the terms of the license. *See Cohen v. Paramount Pictures Corp.*, 845 F.2d 851, 853 (9th Cir. 1988); *see also* 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 10.08 (1988). As stated above, the terms of the 1985 license are clear and unambiguous.

Apple also cites the rule that a licensee infringes the copyright if he significantly alters the licensed work. This rule has no application here because Microsoft is not accused of altering a licensed work; the use of visual displays was licensed, not use of Windows 1.0 as a whole. Moreover, each of the cases on which Apple relies for this proposition involved action by a copyright licensee beyond the scope of the license. *See, e.g., Frank Music Corp. v. Metro–Goldwyn Mayer, Inc.*, 772 F.2d 505, 511–12 (9th Cir.1985) (performance of musical composition accompanied by visual representations of dramatic work from which music came violated license expressly limited to performing music); *Gilliam v. American Broadcasting Co.*, 538 F.2d 14, 20–21 (2d Cir.1976) (licensee's unilateral editing of television programs violated express provision of license requiring author's consent for changes). In this case, the license specifically authorized the use of "visual displays generated by [Windows 1.0]" "in present and future software products." (Microsoft Memo., Ex. A, Agreement, Preamble & ¶ 2.) Thus the use of selected visual displays in other programs must necessarily have been intended—if it was not, Microsoft would be exposed to a possible infringement claim whenever it used any-

thing less than the entire Windows 1.0 interface. Such a result cannot be squared with the plain language of the Agreement.

It is, of course, true, as Apple argues, that in determining whether an audiovisual work infringes, the work must be viewed as a whole. But where a work includes licensed features as well as unlicensed features, infringement depends on whether the unlicensed features are entitled to protection; licensed features are treated as being in the public domain. *Cf. Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 208 (9th Cir.1988) (substantial similarity of unprotected expression does not support finding of infringement).

In its prior ruling the Court concluded that overlapping windows, as featured in Windows 2.03, are a visual display within the meaning of the 1985 Agreement and are not within the scope of the license. 709 F.Supp. at 929. But overlapping windows, obviously, are not the only visual display in Windows 2.03. And equally obviously, because Windows 1.0 did not have overlapping windows, it must have had other visual displays or else the license would have been an empty gesture. It must be concluded therefore that the Agreement licenses the use of the visual displays in Windows 1.0 and to that extent provides a partial defense to infringement claims based on the use of such visual displays.

## II.

The question before the Court, therefore, is which visual displays in Windows 2.03 and NewWave are visual displays licensed under the 1985 Agreement.[5]

The Agreement does not specifically define the term "visual display" and, on the record of these motions, there is no basis for attributing to it a specific, technical meaning. The term should therefore be given a reasonable interpretation, consistent with its facial meaning and the purpose of the license to protect Microsoft against infringement claims for using visual dis-

---

**5.** The Court does not address the questions of whether Apple's copyright is valid or, if so, whether any unlicensed visual displays are sub-

stantially similar to any of Apple's copyrighted material.

plays covered by the Agreement. A visual display necessarily is what the user sees on the screen. In the context of the Agreement it consists of or includes those features to which one would look to assess similarity for purposes of determining whether the copyright has been infringed. *See Data East*, 862 F.2d at 208.

This interpretation is consistent with Apple's prior usage. In its previous summary judgment memorandum, Apple referred to a photograph of a screen display from Windows 2.03 containing three overlapping windows. (Apple Memo. filed 1/27/89 at 17, referring to Apple Appendix filed 1/27/89, Ex. 47.) Apple referred to "all of the visual displays that appear" in this photograph, and then proceeded to list the following: "the window border, the window frame, the menu box outline, the dialog box outline, the scroll bars, check boxes and buttons." (*Id.*)

Apple has submitted a list of 189 "similarities in particular features" between its copyrighted audio visual works and Windows 2.03 and NewWave.[6] (Apple Pretrial Stmt., Ex. A.) Microsoft claims that 178 of the 189 identified features are also features of Windows 1.0 and has submitted a video tape in support of its claim. (Trower Dec. filed 6/9/89, Ex. B (videotape) and Ex. 2 (list of features).) Apple has also submitted a list of 39 differences between the features of Windows 1.0 and those of Windows 2.03, and a videotape demonstrating some of these differences; it does not contend, however, that all of these new features infringe its copyrights.[7] (Exs. A and B to Apple's Memo.) Microsoft contends that twenty-nine of these differences are not included in Apple's list of similarities between Windows 2.03 and the Macintosh user interface, six relate to the change from tiled to overlapping main application windows, two relate to the changes in the use of icons, and the other two are trivial. (Microsoft Response Memo. 22.)

The Court has reviewed all of the papers and related videotapes submitted by the parties, as well as the exhibits submitted in this and the previous phase of these summary judgment motions.

This review discloses that both Windows 1.0 and Windows 2.03 have many visual displays that are also found in the Macintosh user interface. It also discloses, however, that most visual displays in Windows 2.03 are also in Windows 1.0 and, therefore, are covered by the 1985 license.

The features identified by Apple as potentially infringing fall into six categories: (1) design and appearance of individual main application windows (Apple Pretrial Stmt., Exs. A, A–2 through A–7, A–9, C, E); (2) design and appearance of dialog boxes (*id.*, J–O); (3) menu design and appearance (*id.*, F); (4) design and appearance of individual applications programs included with Windows 1.0 and 2.03 (*id.*, P–W); (5) icon design, appearance, and manipulation (*id.*, G); and (6) arrangement and manipulation of multiple main application windows (*id.*, A–1, A–8, B, D). The features in the first four and most of the fifth of these groups are, except for insignificant differences, the same in the two versions of Windows.[8]

1. *Appearance of individual main application windows.* The design and appearance of individual main application windows is essentially unchanged from Windows 1.0 to Windows 2.03. Under both versions of Windows, individual main application windows are bordered rectangles[9] with title bars at the top, scroll bars on the bottom and right edges, elevator boxes on the scroll bars, a close-box at the left end

---

6. Apple has identified an additional fifty visual features found only in NewWave that it contends are substantially similar to visual features in the Macintosh user interface.

7. In fact, some of the items in this list are not found in the Macintosh graphic user interface.

8. All features in groups H and I and some features in groups F, G, and J are found in NewWave only; HP does not contend that they are covered by the license. They are therefore not affected by this ruling.

9. Windows 2.03 added a filled border running completely around each window. This feature is not found in Macintosh windows.

of the title bar,[10] and a sizing box at the bottom right corner of the window. Scrolling is identical between the two versions. Window sizing is essentially the same: under both versions, a window may be resized by dragging the mouse from the lower right corner of the window and a grey outline of the window follows the mouse. Although the default colors of the various components of the windows are different between the two versions, this is not a significant change. Where Windows 1.0 has a sizing box at the right end of the title bar, Windows 2.03 has two zoom arrows; however, the Macintosh has neither of these features.

2. *Dialog boxes.* Both versions of Windows use dialog boxes that may overlap the main application windows and that contain checkboxes, radio buttons, and rectangular buttons. The appearance of these items is essentially the same between the two versions. Microsoft changed the label of a standard button that appears in all dialog boxes from "Ok" to "OK"; although the Macintosh also uses "OK," this change is not significant. Minor changes were made in the underlining of button labels, but this feature is not found in the Macintosh graphic user interface.

3. *Menus.* Menu design and appearance is essentially the same in both versions of Windows. A horizontal bar, called the menu bar, extends across the top of each main application window. This bar contains a left-justified list of menu names. When a menu name is selected with the mouse, a pull down menu appears below the menu name. The pull down menu contains a vertical list of menu items which can be selected with the mouse. Windows 2.03 indicates keyboard accelerators, which allow the user to choose a menu item from the keyboard without using the mouse, by underlining; Windows 1.0 does not have this feature, but neither does the Macintosh.

4. *Applications programs.* Both versions of Windows come with a package of applications programs including a text editor, paint program, file management program, database management program, clipboard, clock, and calculator. All of these programs are essentially the same in both versions of Windows. The only feature of these programs that Apple identifies as being different is that Windows 1.0 allows the user to change the size of the calculator window but Windows 2.03, like the Macintosh, does not. This, however, does not involve different visual displays.

5. *Icons.* In both versions of Windows, a main application window may be collapsed into an icon which can be moved around the screen with the mouse. Both versions of Windows also allow the user to open an icon into its associated window.

Microsoft made some changes in its use of icons between Windows 1.0 and Windows 2.03. Windows 1.0 allows icons to be stored only in a special field at the bottom of the screen; Windows 2.03, like the Macintosh, allows icons to be stored anywhere on the screen in front of or behind open windows. In Windows 1.0 the name of an icon, when displayed, is above the icon; in Windows 2.03 the name of an icon, when displayed, is below the icon.[11] These changes in the appearance and use of icons are not covered by the 1985 license.

6. *Representation of multiple main application windows.* As the Court noted in its prior Order, the main change from Windows 1.0 to Windows 2.03 was the change from a tiled display of multiple main application windows to an overlapping display. This change had a direct effect on the appearance and manipulation of windows and required many changes in visual displays.

In the tiled windowing system used in Windows 1.0, all open main application windows are visible to the user and are arranged side by side, like tiles on a floor. The screen is always entirely filled by whichever windows happen to be open at any given time. When one window is

---

**10.** The appearance of the close-box was changed slightly.

**11.** In Windows 2.03, when an icon is at the bottom of the screen, its name, when displayed, overlaps the icon.

opened, closed, moved, or resized, all other windows must be redrawn to accommodate the change.

In an overlapping window system such as is used in Windows 2.03 and in the Macintosh graphic user interface, open main application windows are overlapped, appearing like papers loosely stacked on a desk. The active window is automatically moved to the top of the stack. Because the open windows overlap, each window may be sized and moved independently of all other windows. When one window is opened, closed, moved, or resized, all other windows remain the same except to the extent that previously visible portions are covered and previously covered portions are revealed.

The changes in visual displays from Windows 1.0 to Windows 2.03 necessary to implement the overlapping windows system are not covered by the 1985 license.

CONCLUSION

For the foregoing reasons, the Court holds

(1) that the use of visual displays in Windows 2.03 that are in Windows 1.0 and the named applications programs is licensed by the 1985 Agreement;

(2) that the visual displays used in Windows 2.03 are in Windows 1.0 and the named applications programs except for those relating to the use of overlapping main application windows, as opposed to tiled main application windows, and except for the specified changes in the appearance and manipulation of icons; and

(3) that Microsoft and its licensee HP are therefore entitled to partial summary judgment on Apple's infringement claim insofar as it is based on the use in Windows 2.03 and in NewWave of visual displays in Windows 1.0 and the named applications programs.

Accordingly, this ruling constitutes a summary adjudication that defendants' use in Windows 2.03 and in NewWave of the visual displays in Windows 1.0 and the named applications programs is protected against Apple's infringement claim by the license provision in the 1985 Agreement.

In the case of Windows 2.03, this applies to all visual displays except the use of overlapping main application windows and the specified changes in the appearance and manipulation of icons.

The Court will therefore now proceed to determine whether the use of those unlicensed visual displays in combination with licensed visual displays infringes Apple's audiovisual copyrights.

Counsel shall meet and discuss how that determination may be expeditiously and properly made. A status conference will be held on September 8, 1989 at 10:00 a.m.

IT IS SO ORDERED.